UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

CHERYL ANN FRIDIE,

                Plaintiff,          16-cv-09042 (JGK)

      - against –          MEMORANDUM OPINION
                                 AND ORDER
COMMISSIONER OF SOCIAL SECURITY,

                Defendant.

JOHN G. KOELTL, District Judge:

    The plaintiff, Cheryl Ann Fridie, brought this action to
reverse a final decision of the defendant, the Commissioner of
Social Security (the "Commissioner"), that the plaintiff was not
entitled to Supplemental Security Income ("SSI") or Disability
Insurance Benefits ("DIB," together with SSI, "disability
benefits"). The plaintiff filed applications for SSI and DIB
benefits on February 5, 2014, alleging that her disability began
on January 15, 2014. The plaintiff alleged disability based on
back pain, right knee and foot pain, and arthritis. Her
application was denied initially on April 24, 2014. After a
hearing on July 16, 2015, an Administrative Law Judge ("ALJ")
denied the plaintiff's application on August 3, 2015, finding
that the plaintiff was not disabled. The ALJ's decision became
the final decision of the Commissioner after the Appeals Council
declined to review it on September 21, 2016. The parties have
filed cross-motions for judgment on the pleadings pursuant to

Rule 12(c) of the Federal Rules of Civil Procedure, and the plaintiff has also filed a supplemental motion for remand.

## I.

## A.

The administrative record reflects the following facts.

The plaintiff has a history of neck and back pain and pain in both knees, particularly her right knee. On February 3, 2005, the plaintiff was treated at St. Luke's Roosevelt Hospital ("St. Luke's") for chronic pelvic pain over the preceding five years. Certified Administrative Record ("Tr.") 272.

On March 8, 2010, a series of MRIs were performed on the plaintiff. An MRI of the plaintiff's cervical spine revealed mild narrowing of the neural foramen due to bony spurring at C4-5 and C5-6, indicating disc herniation and radiculopathy. Tr. 304. An MRI of the thoracic spine revealed "[d]isc desiccation throughout," also indicating herniation and radiculopathy. Tr. 305. An MRI of the plaintiff's lumbar spine revealed a disc bulge, central posterior annular tear, and disc herniation at L5-S1 and straightening of the lumbar spine, possibly due to muscle spasm. Tr. 307. An MRI of the plaintiff's right knee indicated internal derangement and a longitudinal tear of the posterior horn medial meniscus. Tr. 306. Finally, an MRI of the pelvis revealed mild arthropathy of the pubic symphysis. Tr. 308.

Sometime later in 2010, the plaintiff returned to St. Luke's for a consultation. The plaintiff's torn right meniscus, back pain due to disc desiccation and bone spurring at C4-5 and C5-6 and herniated disc at L5-S1 were noted. Tr. 260. The consulting physician also noted that an MRI conducted on August 9, 2010 showed left frontal microvascular ischemic white matter disease. Tr. 260.

On May 11, 2011, the plaintiff visited the Ryan Center complaining of lower back and bilateral knee pain that was not relieved by tramadol. Tr. 244. The examiner assessed back pain and symptoms of a neck disorder and prescribed Medrol and Flexeril. Tr. 244. The examiner referred the plaintiff to the pain medicine unit for severe lumbar and cervical back pain with disc herniation and to neurosurgery to evaluate the neurologic compromise, low back pain, and disc herniation. Tr. 244.

On June 4, 2011, the plaintiff had a neurosurgical consultation. She requested forms to apply for disability, reporting that she could not work because of her knee pain. Tr. 265. The plaintiff reported that neither physical therapy nor epidural steroid injections relieved her pain. The consulting physician referred her to Dr. Reid's Neck and Back Clinic and noted that neurosurgery was not indicated at that time. Tr. 265.

On June 6, 2011, the plaintiff returned to the Ambulatory Care unit at St. Luke's. The plaintiff reported that she had

suffered from lower back pain for 15 years, but that the pain had progressively worsened over the previous year. Tr. 267. She reported that the pain radiated down her lower back, especially from the knee down and in her right big toe. Tr. 267. The plaintiff had an epidural steroid injection, another MRI, and an ultrasound scheduled for July. Tr. 267.

On August 15, 2011, the plaintiff visited the Ambulatory Surgery Center at St. Luke's, complaining of lower back pain radiating down her legs. Tr. 252. The treating physician diagnosed lower back pain and administered an epidural steroid injection. Tr. 252.

An x-ray performed on September 8, 2011 of the plaintiff's lumbar spine showed facet sclerosis at L5-S1 and to a lesser degree at L4-5. Tr. 315. No disc narrowing was observed. Tr. 315. An x-ray of her right knee showed mild productive spurring in the medial and lateral femur, medial and lateral tibia, tibial spines, and the patella. Tr. 315. No significant compartmental narrowing was observed. Tr. 315.

On September 28, 2011, the plaintiff returned to the Ambulatory Care unit at St. Luke's. She complained of progressively worsening lower back pain, which radiated down her legs, especially on her right side. Tr. 270. She was able to walk independently. Tr. 270.

On September 30, 2011, the plaintiff saw Dr. Leticia Varella for chronic lower back pain. Tr. 262. The plaintiff stated that she was unable to work and requested a letter outlining her disabilities. Tr. 263. Dr. Varella assessed degeneration of the intervertebral disc, referred the plaintiff to orthopedics for her right knee, and told the plaintiff to return the following day to pick up a "letter for disability." Tr. 262-63.

On October 14, 2011, the plaintiff saw Dr. Tamer Elbaz for lower back pain. Tr. 253. Dr. Elbaz reported that the plaintiff had one week of relief after her last procedure, though it is not clear from the record to what procedure Dr. Elbaz was referring. Tr. 253. The plaintiff reported that her pain was worse with sitting in an uncomfortable chair or walking, but standing or sitting relieved the pain. Tr. 253. Dr. Elbaz assessed lumbago and lumbar radiculopathy and administered an epidural steroid injection. Tr. 253.

The plaintiff returned to see Dr. Elbaz on November 10, 2011 and reported that the previous epidural steroid injection provided five days of relief. Tr. 257. The plaintiff planned to have knee surgery for her torn right meniscus with Dr. Hobeika. Tr. 258. Dr. Elbaz again assessed lumbago and lumbar radiculopathy and administered another epidural steroid injection. Tr. 258.

An arterial Doppler ultrasound of the lower extremities administered on May 24, 2012 showed no significant focal plaque formation. Tr. 245, 271.

On June 4, 2012, the plaintiff visited St. Luke's for back pain and radiculopathy. Tr. 249. The attending physician's assistant noted that the plaintiff's MRIs showed no disc herniation. Tr. 249. The physician's assistant noted right side foraminal narrowing at L5-S1 without central canal stenosis and requested further evaluation. Tr. 249.

An MRI of the plaintiff's lumbar spine performed on September 12, 2012 showed no disc desiccation at L5-S1. Tr. 282. A mild annular bulge and facet joint hypertrophy without central canal stenosis was observed at L5-S1, as well as foraminal narrowing, especially on the right side, which were considered stable from a prior examination. Tr. 282. At L4-5, a right greater than left facet joint hypertrophy was observed.

The plaintiff was seen at the Ambulatory Care unit of St. Luke's again on September 20, 2012. It was noted that roughly 12 sessions of physical therapy had not helped her knee pain. Tr. 269.

On May 16, 2013, the plaintiff visited the Hospital for joint diseases and was diagnosed with a pain disorder and lumbar disc narrowing. Tr. 247. She was prescribed Mobic and hydrocodone-acetaminophen. Tr. 247.

A May 30, 2013 x-ray of the plaintiff's spine showed shallow S-shaped scoliosis of the thoracolumbar spine. Tr. 309.

On July 8, 2013, the plaintiff visited Dr. Jonathan Kuo, who reported that the plaintiff's "[p]ain [was] severe and debilitating to [the plaintiff's] quality of life." Tr. 351. Dr. Kuo observed that the plaintiff had an antalgic gait and walked without assistance of a device. Tr. 351. Dr. Kuo's examination of the plaintiff revealed tenderness of the paraspinal muscles, tenderness over the sacroiliac joints, spasms in the paraspinal region, limited lumbosacral flexion of 50, limited lumbosacral extension, and limited left and right lumbosacral rotation and lateral flexion. Tr. 351. The plaintiff had diminished sensation to light touch or temperature, decreased strength against resistance in the lower extremity (4+/5), reflexes 1+, and no atrophy. Tr. 351. Dr. Kuo reported no scoliosis in the plaintiff's neck. Tr. 351. Dr. Kuo assessed lumbosacral radiculopathy, lumbar disc displacement, and pain in limb and administered an epidural steroid injection. Tr. 351.

On August 2, 2013, the plaintiff visited Dr. Kuo again. Although Dr. Kuo noted that the previous epidural injection had helped significantly, improving the plaintiff's pain by 70%, he also noted that the pain had been returning recently and that the plaintiff complained of stiffness and tightness in her neck, with diminished range of motion. Tr. 353. Dr. Kuo noted that the

plaintiff had done extensive physical therapy over the past several years, with limited results. Tr. 353. Dr. Kuo's physical examination revealed nearly identical findings to those reported on July 8. Dr. Kuo assessed cervical spondylosis, sprain of neck, lumbosacral radiculopathy, lumbar disc displacement, and limb pain. Tr. 354. Dr. Kuo administered cervical facet blocks to determine whether the facet joints were a contributor to the plaintiff's persistent neck pain. Tr. 354.

An x-ray of the plaintiff's knees conducted on August 5, 2013 revealed osteoarthritis in both knees, with minimal mediolateral narrowing, productive spurring in the right medial compartment and right tibial spines, patellofemoral degenerative joint disease in the right knee and to a lesser extent in the left knee. Tr. 310.

The plaintiff returned to Dr. Kuo on August 7, 2013, complaining of "excruciating" pain in her neck, low back, and knee. Tr. 312. Dr. Kuo observed that the plaintiff was unable to move her arms. Tr. 312. Dr. Kuo's examination findings and assessment remained essentially unchanged from his previous reports. Dr. Kuo explained the importance of physical therapy, exercise, injury prevention, and avoiding heavy lifting or repetitive movement and referred the plaintiff for an MRI of the cervical spine. Tr. 314.

On August 28, 2013, the plaintiff returned to Dr. Kuo. Although the plaintiff continued to complain of severe pain in her low back, the MRI Dr. Kuo had ordered showed no evidence of disc herniation or spinal stenosis. Tr. 360. Dr. Kuo's assessments and observations remained unchanged. Tr. 362. Dr. Kuo prescribed cyclobenzaprine for the plaintiff's cervical spondylosis and administered additional bilateral cervical facet blocks. Tr. 362.

On April 2, 2014, the plaintiff saw physician's assistant Sara Durkin at Dr. Muhammad M. Haque's office. At the time, the plaintiff was taking the following medications: Amoxicillin, Chloraseptic Max Sore Throat, Ibuprofen, Meloxicam, Clobetasol Propionate Ointment, Omeprazole, Loratadine, Hydrocodone Acetaminophon, Flexeril, Mobic, Acetaminophen-Codeine, Triamclnolone Aceonide Cream, Cyclobenzaprine HCl, Diclofenac Sodium, Nabumetone, Mucinex, and Robitussin Chest Congestion Syrup. Tr. 386. Physician's assistant Durkin assessed back pain, eczema, Vitamin D deficiency, tobacco use disorder, osteoarthritis of the knee, lumbar disc displacement, lumbosacral radiculitis, and cervical spondyloarthritis. Tr. 386.

The following day, April 3, 2014, the plaintiff returned to Dr. Kuo. The plaintiff again complained of severe lower back pain and described sensations of numbness, tingling, sharp,

throbbing, stabbing, weakness, and piercing in the right foot. Tr. 326. Dr. Kuo again observed that the plaintiff had an antalgic gait and walked without the assistance of any devices. Tr. 326. Dr. Kuo again noted tenderness over the paraspinal muscles, sacroiliac joints, facet joints, trapezius muscles, low cervical region, and in the C4-C7 region bilaterally; spasms in the paraspinal region; limited range of motion in the lumbosacral flexion; limited lumbosacral extension; and limited bilateral rotation and flexion. Tr. 326. Dr. Kuo also noted that the plaintiff did not have diminished sensation to light touch or temperature, that her lower extremity motor strength was slightly decreased, that the plaintiff's upper extremity motor strength remained normal, and that her straight leg raise was positive at 45 degrees. Tr. 326-27. Dr. Kuo assessed lumbosacral radiculopathy, lumbar disc displacement, cervical spondylosis, sprain of neck, and limb pain. Tr. 327. Dr. Kuo administered an epidural steroid injection. Tr. 327.

The plaintiff returned to Dr. Kuo for another epidural steroid injection on April 7, 2014. Tr. 366.

On June 18, 2014, the plaintiff saw nurse practitioner Jacqueline Flores at Dr. Haque's office, requesting a referral for psychological care and pain management. Tr. 388. Nurse Flores repeated the assessment from the plaintiff's previous

visit to Dr. Haque's office and referred the plaintiff for physical therapy and pain management. Tr. 389.

On July 7, 2014, the plaintiff returned to Dr. Kuo, complaining of lower back pain. Tr. 369. Although the plaintiff reported 70% improvement and relief for a period of time after her last epidural steroid injection, her pain had returned to an 8/10 on the day of her visit. Tr. 369. The plaintiff's pain was made worse with walking, standing, bending, sitting, and going up and down stairs. Dr. Kuo's observations and findings upon examination were essentially unchanged from his previous reports, and he administered another epidural steroid injection. Tr. 369-370.

On September 3, 2014, the plaintiff returned to Dr. Kuo. The plaintiff complained of severe pain in the mid and low back and numbness in her toes. Tr. 377. The plaintiff explained that the epidural steroid injections Dr. Kuo had been administering each helped for about three weeks. Tr. 377. Dr. Kuo prescribed a Flector Patch film and cyclobenzaprine for the plaintiff's muscle pain and administered trigger point injections. Tr. 378.

On October 20, 2014, the plaintiff saw Dr. Kuo for severe lower back pain. Tr. 380-81. Dr. Kuo reported that the pain was worsened by walking for long periods of time, and that sometimes the plaintiff limped. Tr. 381. Dr. Kuo's assessments and examination findings were consistent with those from previous

visits, and he administered another epidural steroid injection. Tr. 382.

On January 23, 2015, the plaintiff saw physician's assistant Durkin at Dr. Haque's office for severe back pain. Tr. 400. The plaintiff reported that her medications were not working. Tr. 400. Ms. Durkin prescribed tramadol and valium. Tr. 400. The plaintiff saw physician's assistant Durkin again on May 19, 2015, seeking a referral for podiatry, pain management, physical therapy, and psychiatry, which Ms. Durkin provided. Tr. 408, 409.

An MRI of the plaintiff's lumbar spine performed on June 5, 2015 showed scoliosis of the lumbar spine; posterior subligamentous disc bulging with facet hypertrophic at T10/11; posterior peripheral disc bulging at L2/3; left-sided posterior peripheral disc bulging at L3/L4; a posterior disc bulge at L4/5; posterior central broad-based disc bulging with extension into the anteroinferior foramina at L5/S1; and disc hydration loss with anterior disc extension at T10/11, L1/2, and L5/S1. Tr. 410-11. These findings were consistent with inflammatory/noninfectious posterior paraspinal fasciitis. Tr. 411.

An MRI of the cervical spine performed the same day showed a posterior left paracentral disc bulge impressing the central spinal fluid at C2/3; a posterior left paracentral disc bulge

impressing the ventral central spinal fluid at C3/4; a posterior
broad-based central disc bulge impressing on the ventral central
spinal fluid at C4/5; a posterior broad-based central disc bulge
at C5/6; a posterior subligamentous disc bulge at C6/7; right
facet hypertrophic change impressing the posterolateral thecal
sac with left-sided posterior peripheral subligamentous disc
bulging at T2/3; and a right facet hypertrophic change
impressing the posterolateral thecal sac with right paracentral
disc protrusion at T3/4. Tr. 414.

On June 17, 2015, the plaintiff visited the emergency room
at St. Luke's complaining of knee pain from a motor vehicle
accident that had occurred one month before; she was diagnosed
with a contusion. Tr. 415-421. She was prescribed acetaminophen
and oxycodone for pain. Tr. 418. The plaintiff visited
physician's assistant Durkin at Dr. Haque's office two days
later, on June 19, for knee pain and was referred for an MRI of
her left knee. Tr. 422-23.

**B.**

As part of her application for disability benefits, the
plaintiff was evaluated by Dr. Benjamin Kropsky, who evaluated
her on behalf of the Division of Disability Determination; Dr.
Kuo, one of the plaintiff's treating physician; and Dr. Haque,
along with physician's assistant Durkin, also treating
professionals for the plaintiff. The plaintiff's medical records

were also assessed by Dr. S. Putcha as part of a Disability
Determination Explanation.

(i).

On April 10, 2014, the plaintiff visited Dr. Kropsky. Dr.
Kropsky noted that the plaintiff's x-rays and MRIs showed
degenerative changes and lumbar radiculopathy and that the
epidural steroid injections the plaintiff had received had not
provided good relief. Tr. 330. Dr. Kropsky noted that the
plaintiff had difficulty sitting, standing, bending, and
squatting; that she was limited in walking and climbing stairs;
and that the plaintiff was limited in her ability to lift and
carry, never lifting or carrying more than five pounds. Tr. 330.

Dr. Kropsky noted that the plaintiff had medial meniscus
damage and degenerative joint disease of the right knee and, to
a lesser extent, in her left knee. Tr. 330. Because of the
plaintiff's knee pain, the plaintiff generally could only climb
three stairs at a time before having to stop and could walk
slowly up to three blocks. Tr. 330.

Because of pain and limitation of motion in her right
shoulder, the plaintiff needed help with most household chores.
The plaintiff reported cooking three times per week, sometimes
with help; doing laundry every two weeks with help; shopping
once per month with help pushing the shopping cart; showering
daily without assistance; dressing herself daily; and watching

14

TV, listening to the radio, and reading. Tr. 330-31. At the time of the visit, the plaintiff was taking Naproxen, Gabapentin, Hydrochlorothiazide, and Vitamin D. Tr. 331.

Dr. Kropsky observed that the plaintiff did not appear in acute distress, that she favored her right side when walking, that she could not walk on her toes, that she could walk on her heels with difficulty, and that she did not use any assistive devices other than a soft back binder. Tr. 332. The plaintiff needed help getting on and off the exam table but was able to rise from a chair with mild difficulty. Tr. 332.

Dr. Kropsky found that the plaintiff's cervical spine showed full flexion and extension, bilateral flexion of 30 degrees and full rotary movement bilaterally. Tr. 333. Dr. Kropsky found no scoliosis or abnormality in the thoracic spine, and that the lumbar spine had 30 degrees of flexion, full extension, and rotary movements of 15 degrees bilaterally. Tr. 333. Dr. Kropsky also observed moderate swelling in the right knee, but no redness, heat, or tenderness to palpitation. Tr. 333. Dr. Kropsky found no sensory deficit and full strength in the upper and lower extremities. Tr. 333.

Dr. Kropsky diagnosed the plaintiff with lumbar radiculopathy, cervical radiculopathy, right knee pain secondary to degenerative joint disease and meniscus tear, left knee degenerative joint disease, and right shoulder pain with

limitation in motion second to arthropathy. Tr. 334. He stated
that the plaintiff had a moderate limitation for lifting,
carrying, and walking and a severe limitation for squatting. Tr.
334.

### (ii).

On April 22, 2014, as part of a Disability Determination
Explanation, Dr. S. Putcha reviewed the plaintiff's medical
records. Dr. Putcha opined that the plaintiff suffered from the
medically determinable impairment of severe spine disorders. Tr.
57. Dr. Putcha examined the findings of Dr. Kropsky, opining
that Dr. Kropsky's report relied heavily on the plaintiff and
was not supported by objective medical evidence. Tr. 58. Based
on the review of the plaintiff's medical records, Dr. Putcha
opined that the plaintiff could occasionally[1] lift or carry 20
pounds; frequently[2] lift or carry ten pounds; and stand, walk, or
sit for a total of six hours in an eight-hour workday. Tr. 58.

### (iii).

On September 3, 2014, Dr. Kuo prepared a Physical Residual
Functional Capacity Questionnaire for the plaintiff. Dr. Kuo
listed the plaintiff's diagnosis as lumbosacral radiculopathy,

---

[1] For purposes of Dr. Putcha's report, "occasionally" was defined
as cumulatively 1/3 or less of an eight-hour day. Tr. 58.

[2] For purposes of Dr. Putcha's report, "frequently" was defined
as cumulatively more than 1/3 up to 2/3 of an eight-hour day.
Tr. 58.

with symptoms of chronic low back pain that radiates down the bilateral extremities. Tr. 345. Dr. Kuo reported clinical findings of tenderness and spasms upon palpation of the cervical and lumbar paraspinal muscles. Tr. 345. Dr. Kuo opined that the plaintiff's symptoms would occasionally interfere with the attention and concentration needed to perform simple work tasks, but that the plaintiff was capable of "low stress" jobs. Tr. 346. Dr. Kuo reported that the plaintiff could walk only two blocks without rest or sever pain, that she could sit or stand for 30 minutes at one time each, and that the plaintiff could sit for a total of four hours and stand for a total of two hours during an eight-hour workday. Tr. 346-47. Dr. Kuo reported that the plaintiff would need to walk three times per day for 15 minutes at a time and required a job where she could shift between sitting, standing, or walking at will. Tr. 347. Dr. Kuo also opined that the plaintiff would need to take one unscheduled, 15-minute break per day, and that she could rarely lift or carry 20 pounds and could occasionally lift or carry up to ten pounds. Tr. 347. Dr. Kuo also reported that the plaintiff could occasionally climb stairs and that the plaintiff could rarely twist, stoop, crouch, or climb a ladder. Tr. 348. Finally, Dr. Kuo opined that the plaintiff would be absent from work an average of two days per month due to her impairments. Tr. 348.

On September 11, 2014, the plaintiff saw physician's assistant Durkin at Dr. Haque's office to fill out paper work in order to apply for disability benefits. That same day, Dr. Haque and physician's assistant Durkin completed a Physical Residual Functional Capacity Questionnaire. The Questionnaire listed the plaintiff's diagnoses as back pain, knee pain, neck pain, osteoarthritis, depression, lumbar disc displacement, cervical radiculitis, and spondylolisthesis. Tr. 337. Dr. Haque reported that the plaintiff had chronic pain in her entire back and suffered from depression as a result. Tr. 337. Dr. Haque reported clinical findings of paravertebral tenderness and spinal tenderness of the cervical and lumbar spine. Tr. 337. Dr. Haque noted that the plaintiff was walking unassisted by a cane with a normal gait, but that she had discomfort sitting during the exam. Tr. 337.

Based in part on the plaintiff's reports, Dr. Haque stated that the plaintiff's symptoms would frequently interfere with the attention and concentration needed to perform even simple work tasks; that the plaintiff could walk eight-to-nine city blocks without rest; that the plaintiff could sit for up to 45 minutes at one time and stand for an hour at one time; and that the plaintiff could sit and stand for about two hours each in an eight-hour workday. Tr. 338. Dr. Haque also reported that the

plaintiff would need to walk eight times per day and be able to shift between sitting, standing, and walking. Tr. 339. Dr. Haque further reported that the plaintiff would need to take unscheduled brakes throughout the workday and would require the assistance of a cane. Tr. 339. Dr. Haque was unable to report how often the plaintiff could lift and carry given weights or perform certain movements. Tr. 339.

## C.

### (i).

At the hearing in front of ALJ Michael Friedman on July 16, 2015, the plaintiff testified to the following facts.

The plaintiff lives by herself, although one of her four daughters comes by periodically to help her. Tr. 31, 32. Her last fulltime job was at a nursing home about three years before, where she was employed for under six months. Tr. 31. Prior to that, the plaintiff's last fulltime job was as a customer service representative with the United States Parcel Service, which lasted four years in the 1980s. Tr. 32. After leaving the United States Parcel Service, the plaintiff consistently worked at temporary jobs because it was easier, as a single mother, to care for her children. Tr. 32.

The plaintiff, who used a cane at the hearing, testified that she was in excruciating pain from her neck down through her toes. Tr. 33. She testified that, although she took muscle

relaxers, they provided no relief and made her drowsy. Tr. 33. While the plaintiff testified that she did physical therapy three times per week, she explained that "at the end of the day, I'm right back where I've been." Tr. 34.

The plaintiff testified that she could stand for about 15 minutes, sit for under an hour, and walk no more than five blocks. Tr. 35. She further testified that she could lift no more than five pounds. Tr. 36. The plaintiff testified that using public transportation was very difficult, and that she was no longer able to shop for groceries or cook for herself. Tr. 36. Aside from physical therapy, the plaintiff testified that most of her day is spent in a chair with particular pillows doing word puzzles, watching TV, and reading, and that "it's really depressing." Tr. 37. The plaintiff testified that she had been seeing a new mental health professional for depression, which she believed stemmed from her physical impairments and inability do the activities she used to do. Tr. 42-43.

Dr. Velchek, a vocational expert, also testified at the hearing. The ALJ prompted Dr. Velchek to provide three examples of jobs meeting the criteria for light work but which could be performed with a "sit/stand option," meaning the person doing the work could transition between sitting and standing without interfering with the work. Tr. 45. Dr. Velchek testified that the job called "cashier, II" fit that criteria. Tr. 46. While

Dr. Velchek testified that the relevant regulations did not address the "sit/stand option," jobs such as gas station cashier, self-service parking lot cashier, or ticket seller fit the criteria based on his experience. Tr. 46. Dr. Velchek testified further that these jobs would allow only about five percent of time off during the workday and about one day off per month, though not on an ongoing basis. Tr. 46-47. Dr. Velchek also testified that these jobs would not permit the employee to walk around during the workday to relieve pain. Tr. 48.

On August 3, 2015, the ALJ issued a decision denying the plaintiff's applications for SSI and DIB. As explained in greater detail below, the ALJ found that the plaintiff had the severe impairments of lumbar and cervical radiculopathy and bilateral knee derangement but that she had the residual functional capacity to perform light work, except the plaintiff required the opportunity to alternate between sitting and standing positions at will. The ALJ therefore concluded that the plaintiff did not have a disability.

**(ii).**

Two months after the ALJ's decision, on October 5, 2015, the plaintiff filed a Form HA-520-U5 requesting review of the ALJ's decision. Tr. 7. The plaintiff stated as the basis for her request that she had an upcoming back operation to treat two herniated discs that were compressing a nerve, and that the

operation included inserting two prosthetic screws. Id. On

September 21, 2016, the Appeals Council denied the plaintiff's

request for review of the ALJ's decision. Tr. 1-6. The Appeals

Council did not address the upcoming surgery described in the

plaintiff's Form HA-520-U5.

On February 13, 2018, after each party's motion for

judgment on the pleadings had been fully briefed and argued, the

plaintiff submitted a supplemental motion for remand pursuant to

sentence six of 42 U.S.C. 405(g), arguing that the case should

be remanded for further proceedings to address the surgery

described in the plaintiff's Form HA-520-U5. The plaintiff

attached medical records of visits to Dr. Andrew Cordiale, D.O.,

on August 25, 2015 and Dr. Sebastian Lattuga, M.D., on September

16 and November 12, 2015. The medical records showed that on

November 12, 2015, Dr. Lattuga performed spinal surgery on the

plaintiff, which included a laminectomy and neurolysis at L5/1;

insertion of pedicle screws, postereolateral fusion, insertion

and fixation of a metal rod, a morselized bone graft, and a BMP

implant. Pl.'s Supp. Mot. Remand Pursuant Sentence Six 42 U.S.C.

405(g) ("Pl.'s Supp. Mot.") (Dkt. No. 40) at 7-11. Dr. Lattgua

noted "SEVERE compression" of the plaintiff's nerve root with

flattening of the nerve root. Id. at 8. The plaintiff was

subjected to general anesthesia during the operation. Id. at 7.

Dr. Cordiale's and Dr. Lattuga's pre-surgery examinations

described that the plaintiff was involved in an automobile accident on May 7, 2015, during which she sustained injury, and directed the plaintiff to avoid heavy lifting, carrying, bending, or any activity that exacerbates her symptoms. Id. at 12, 14, 15, 17. The automobile accident appears to be the same automobile accident that was previously referred to in the medical records before the ALJ. Tr. 410-14, 420.

## II.

A court may set aside a determination by the Commissioner only if it is based on legal error or is not supported by substantial evidence in the record. See 42 U.S.C. §§ 405(g), 1383(c)(3); Berry v. Schweiker, 675 F.2d 464, 467 (2d Cir. 1982) (per curiam) (citations omitted); see also Burton-Mann v. Colvin, No. 15-cv-7392 (JGK), 2016 WL 4367973, at *3 (S.D.N.Y. Aug. 13, 2016). Substantial evidence is "more than a mere scintilla"; it is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1971) (quoting Consol. Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)); see also Mejia v. Berryhill, No. 16-cv-6513 (JGK), 2017 WL 3267748, at *3 (S.D.N.Y. July 31, 2017).

The definition of "disabled" is the same for DIB and SSI. See Barnhart v. Walton, 535 U.S. 212, 214 (2002); see also Mejia, 2017 WL 3267748, at *3. A claimant seeking DIB or SSI is

considered disabled if the claimant is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C § 423(d)(1)(A); accord 42 U.S.C. § 1382(c)(3)(A). Remand is particularly appropriate where an ALJ has failed to develop the record sufficiently and where a remand for further findings would help to assure the proper disposition of a claim. See Butts v. Barnhart, 388 F.3d 377, 386 (2d Cir. 2004); see also Mejia, 2017 WL 3267748, at *4.

There is a five-step framework to evaluate disability claims set out in 20 C.F.R. §§ 404.1520 and 416.920. In essence, "if the Commissioner determines (1) that the claimant is not working, (2) that [s]he has a 'severe impairment,' (3) that the impairment is not one [listed in Appendix 1 of the regulations] that conclusively requires a determination of disability, and (4) that the claimant is not capable of continuing in [her] prior type of work, the Commissioner must find [her] disabled if there is not another type of work the claimant can do." Burgess v. Astrue, 537 F.3d 117, 120 (2d Cir. 2008) (citations omitted); see also, e.g., Selian v. Astrue, 708 F.3d 409, 417–18 (2d Cir. 2013); Mejia, 2017 WL 3267748, at *4.

The claimant must first establish a disability under the Social Security Act (the framework's first four steps). See Burgess, 537 F.3d at 120. If the claimant satisfies those steps, the Commissioner must establish that, given the claimant's residual functional capacity ("RFC"), there is still work the claimant could perform in the national economy (the framework's fifth step). See id. If a claimant cannot perform work in the national economy, then the claimant's condition meets the Act's definition of disability. See id.; see also Mejia, 2017 WL 3267748, at *4.

### III.

In this case, the ALJ found that the plaintiff was not entitled to disability benefits (SSI or DIB) because she was capable of performing light work and because jobs exist in the national economy in sufficient numbers that the plaintiff can perform. At the first step, the ALJ determined that the plaintiff has not engaged in substantial gainful activity since January 15, 2014, the date her alleged disability began. Tr. 13. At the second step, the ALJ found that the plaintiff suffers from the severe impairments of lumbar and cervical radiculopathy and bilateral knee derangement. Tr. 13. At step three, the ALJ determined that the plaintiff does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. Part 404,

Subpart P, Appendix 1. Tr. 15. At step four, the ALJ found that,
despite the plaintiff's severe impairments, she retains the RFC
to do light work as defined in 20 C.F.R. 404.1567(b) and
416.967(b), with the added condition that the plaintiff be able
to alternate between sitting and standing at will. Tr. 16. At
step five, the ALJ found that, despite the fact that the
plaintiff has no relevant past work, jobs exist in significant
numbers in the national economy that the plaintiff can perform
in light of her age, education, work experience, and residual
functional capacity. Tr. 20.

**A.**

"[T]he 'treating physician rule' directs the ALJ to give
controlling weight to the opinion of the treating physician so
long as it is consistent with the other substantial evidence."
Morgan v. Colvin, 592 F. App'x 49, 50 (2d Cir. 2015) (quoting
Halloran v. Barnhart, 362 F.3d 28, 32 (2d Cir. 2004) (per
curiam)). "When other substantial evidence in the record
conflicts with the treating physician's opinion, however, that
opinion will not be deemed controlling. And the less consistent
that opinion is with the record as a whole, the less weight it
will be given." Snell v. Apfel, 177 F.3d 128, 133 (2d Cir.
1999). Even if a treating physician's opinion is not afforded
controlling weight, the Commissioner applies various factors in
determining the weight to give the opinion. 20 C.F.R.

§§ 404.1527(c), 416.927(c). Moreover, the Commissioner is required to explain the weight it gives to the opinion of a treating physician. See id. §§ 404.1527(c)(2), 416.927(c)(2). "In many cases, a treating source's medical opinion will be entitled to the greatest weight and should be adopted, even if it does not meet the test for controlling weight." Dyson v. Astrue, No. 2:09-cv-3846, 2010 WL 2640143, at *5 (E.D. Pa. June 30, 2010) (quoting Social Security Ruling ("SSR") 96-2p, 1996 WL 374188, at *4 (July 2, 1996)). A district court may remand without hesitation "when the Commissioner has not provided good reasons for the weight given to a treating physician's opinion." Morgan, 592 F. App'x at 50; see also Mejia, 2017 WL 3267748, at *4.

In this case, the ALJ accorded little weight to the opinion of Dr. Kuo, one of the patient's treating physicians, without sufficient justification. This was error.

The ALJ found that the plaintiff was capable of light work notwithstanding Dr. Kuo's opinion, which stated that, while the plaintiff could sit and stand for a combined six hours in an eight-hour workday, the plaintiff could only occasionally lift up to ten pounds and that she would be absent from work about two days per month due to her impairments.[3] Because light work

---

[3] Light work is defined by 20 CFR § 416.967(b). "Light work involves lifting no more than 20 pounds at a time with frequent

requires the ability to _frequently_ lift up to ten pounds, if the
ALJ had deferred to Dr. Kuo's opinion, the ALJ would likely have
determined that the plaintiff is disabled because she is not
capable of performing light work. 20 C.F.R. § 416.967.

The ALJ reasoned that "the limitations Dr. [Kuo] [found]
are not proportionate with his limited objective findings as
noted in his treatment notes." Tr. 17 (citation omitted). But
the ALJ did not explain why Dr. Kuo's findings were "not
proportionate" with Dr. Kuo's objective medical findings.
Moreover, the ALJ did not attempt to reconcile his rejection of
Dr. Kuo's opinion with the other objective medical evidence in
the record that supported Dr. Kuo's assessments, such as the
plaintiff's June 5, 2015 MRIs, which showed scoliosis and
pervasive disc bulging; the x-ray of the plaintiff's knees
conducted on August 5, 2013, which revealed osteoarthritis in
both knees and degenerative joint disease in the right knee and

---

lifting or carrying of objects weighing up to 10 pounds. Even
though the weight lifted may be very little, a job is in this
category when it requires a good deal of walking or standing, or
when it involves sitting most of the time with some pushing and
pulling of arm or leg controls. To be considered capable of
performing a full or wide range of light work, you must have the
ability to do substantially all of these activities. If someone
can do light work, we determine that he or she can also do
sedentary work, unless there are additional limiting factors
such as loss of fine dexterity or inability to sit for long
periods of time." 20 C.F.R. § 416.967(b); see also id.
§ 404.1567(b).

to a lesser extent in the left knee; nor with the uncontested fact that the plaintiff has a torn right meniscus.

Moreover, the ALJ failed to explain why he gave greater weight to the opinion of Dr. Putcha, who never even examined the plaintiff. While the ALJ gave significant weight to Dr. Kropsky's opinion, Dr. Kropsky opined that the plaintiff had moderate restrictions on lifting and carrying secondary to right shoulder pain, low back pain, and cervical pain. The thrust of Dr. Kropsky's opinion was thus consistent with Dr. Kuo's opinion. Indeed, while the ALJ "granted great weight" to the opinion of Dr. Putcha, the State Agency consultant who evaluated the plaintiff's medical records, the ALJ failed to reconcile this weight with the fact that Dr. Putcha's report was overtly critical of Dr. Kropsky's evaluation. In fact, Dr. Putcha opined that Dr. Kropsky's report was not supported by objective medical evidence. Thus, the evidence in the record warranted the ALJ's giving significant weight to Dr. Kuo's opinion and did not support the weight the ALJ gave to Dr. Putcha's opinion. Remand is appropriate in this case so that the ALJ can reconsider the plaintiff's RFC.

**B.**

Remand is also required in this case pursuant to sentence four of 42 U.S.C. § 405(g) because the Appeals Council ignored the new and material evidence that the plaintiff presented that

supported the opinion of the plaintiff's treating physician that the plaintiff has a disability based on a significant back impairment.

When new material evidence is submitted that supports the opinion of a treating physician whose opinion the ALJ discounted, it is error for the Appeals Council not to review a case, and simply to adopt the opinion of the ALJ, without providing good reasons for the weight it assigned to the treating physician in light of the new evidence. McIntire v. Astrue, 809 F. Supp. 2d 13, 20 (D. Conn. 2010). That is because "[i]n such a case, denying review fails to provide good reasons for weight afforded (i.e., none) to the new evidence (e.g., inconsistent treating physician opinion)." Id. (explaining that "the duty imposed on the Commissioner by the regulations to explain the weight given the treating physician's opinion extends to the Appeals Council review stage if the evidence submitted to the Appeals Council requires further explanation.")

The new evidence submitted by the plaintiff in this case required further explanation. In her October 5, 2015 request for review of the ALJ's decision, the plaintiff stated that she had an impending back operation to treat two herniated discs and that the operation required the insertion of prosthetic screws. Tr. 7. The parties did not address this prospective surgery, and the Appeals Council did not consider it. The Appeals Council

allowed the ALJ decision to stand without exploring at all the medical evidence supporting the prospective back surgery, even though on its face the back surgery would have supported Dr. Kuo's opinion.

The new evidence submitted on this appeal, which existed before the Appeals Council decision and would have been available to the Appeals Council, supported Dr. Kuo's opinion with respect to the severity of the plaintiff's back problem. The back problem was severe enough to require significant back surgery, and the reports by both Dr. Cordiale and Dr. Lattuga -- before the surgery and before the Appeals Council decision -- reported disc bulges and significant pain and recommended that the plaintiff avoid activity that would exacerbate her symptoms. Plainly, this new evidence should have impacted the weight the Appeals Council assigned to Dr. Kuo's opinion, which the ALJ had erroneously discounted because it was "not proportionate" to the objective medical findings. See McIntire, 809 F. Supp. 2d at 20. For this reason alone, this case must be remanded.

The failure of the Appeals Council to pursue the plaintiff's submission that she was about to have a major back operation is particularly troubling because the appeals Council has an obligation to consider "new [and] material" evidence that "relates to the period on or before the date of the administrative law judge hearing decision," when "there is a

reasonable probability that the additional evidence would change the outcome of that decision." 20 C.F.R. §§ 404.970(a), 416.1470(a); Perez v. Chater, 77 F.3d 41, 45 (2d Cir. 1996); Patterson v. Colvin, 24 F. Supp. 3d 356, 372 (S.D.N.Y. 2014).

The Court of Appeals has explained that "medical evidence generated after an ALJ's decision cannot deemed irrelevant solely because of timing . . . ." Newbury v. Astrue, 321 F. App'x 16, 18 n.2 (2d Cir. 2009). Rather, the Court of Appeals has remanded cases where new evidence "strongly suggests that, during the relevant time period, [the plaintiff's] condition was far more serious than previously thought . . . ." Pollard v. Halter, 377 F.3d 183, 193 (2d Cir. 2004).

The Commissioner argues that the evidence of the prospective back operation is not relevant because it does not relate to the period prior to August 3, 2015, the date of the ALJ decision, and because it is not material. In this case, it is reasonably likely that the new evidence showing that the plaintiff (i) was injured in an automobile accident on May 7, 2015, prior to the administrative hearing,[4] and (ii) ultimately required substantial surgery, including surgically implanting metal screws and a rod in her spine, would have impacted the

---

[4] The administrative record contains a reference to an automobile accident, see Tr. 420, but does not contain information showing the effect of the accident on the plaintiff's physical capabilities, although the plaintiff was treated with substantial narcotic pain killers.

ALJ's determination of whether the plaintiff was disabled on or before August 3, 2015. The Commissioner argues that the new evidence "is entirely consistent with the residual functional capacity" of light work determined by the ALJ and thus would not have changed the ALJ's determination that the plaintiff was not disabled. Def.'s Reply at 3. That is a medical judgment that is for the doctors to make and which, on its face, appears inconsistent with the reports of the two new doctors.

The Commissioner argues that the new evidence "post-dates the relevant period" and therefore is not relevant to the plaintiff's application for disability benefits. Def.'s Reply at 3. However, the doctors' reports concerning the plaintiff's condition and the prospect of surgery all existed prior to the Appeals Council decision and reasonably shed light on the severity of the plaintiff's condition prior to the ALJ decision. See Williams v. Comm'r of Soc. Sec., 236 F. App'x 641, 644 (2d Cir. 2007) (district court erred in finding that remand not required because new medical evidence post-dated the period for which benefits had been claimed); Davidson v. Colvin, No. 12-cv-316, 2013 WL 5278670, at *8 (N.D.N.Y. Sept. 18, 2013) ("The categorical refusal to consider evidence solely because it was created after the date of the ALJ's decision is an error as a matter of law.").

Moreover, under the regulations applicable at the time the plaintiff submitted her Form HA-520-U5, the Appeals Council was obligated to "evaluate the entire record including the new and material evidence of record if it relates to the period on or before the date of the administrative law judge hearing decision." Def.'s Reply (citing 20 C.F.R. §§ 404.970(b), 416.1470(b) as they existed on August 3, 2015).[5] Under internal guidelines in effect at the time the plaintiff submitted the Form HA-520-U5, the Appeals Council was also obligated to "make necessary attempts . . . to obtain the evidence . . ." the plaintiff referred to if it related to the period on or before the date of the ALJ's decision. See Hearings and Appeals Litigation and Law Manual (HALLEX I-3-2-15A-C), attached to Def.'s Reply. The Appeals Council should have sought to verify the plaintiff's report of an impending surgery and obtain the corresponding medical records. That the plaintiff's handwritten petition for review in light of her impending surgery turned out

---

[5] The current regulations, effective as of January 17, 2017, provide in pertinent part:

(a)   The Appeals Council will review a case if—
      . . .
      (5) Subject to paragraph (b) of this section, the Appeals Council receives additional evidence that is new, material, and relates to the period on or before the date of the hearing decision, and there is a reasonable probability that the additional evidence would change the outcome of the decision.

20 C.F.R. §§ 404.970(a), 416.1470(a).

to be wholly founded only underscores the need for a thorough examination of new evidence submitted subsequent to a claimant's administrative hearing.

As the Court of Appeals has explained, "[t]he Social Security Act is a remedial statute which must be liberally applied; its intent is inclusion rather than exclusion." Marcus v. Califano, 615 F.2d 23, 29 (2d Cir. 1979) (internal quotation marks omitted). Both the ALJ and the Appeals Council failed to do so in this case.

**CONCLUSION**

The Court has considered all of the arguments of the parties. To the extent not specifically addressed above, the remaining arguments are either moot or without merit. For the foregoing reasons, the plaintiff's motion for judgment on the pleadings pursuant to sentence four of 42 U.S.C. § 405(g) is **granted**, the Commissioner's cross-motion for judgment on the pleadings is **denied**, the Commissioner's decision is **vacated**, and the case is **remanded** to the Commissioner for further proceedings. The Clerk is directed to enter judgment and to close this case. The plaintiff's alternative motion to remand pursuant to sentence six of 42 U.S.C. § 405(g) is denied as moot.

**SO ORDERED.**

Dated:     New York, New York
           March 19, 2018

                                          _____
                                                 John G. Koeltl
                                          United States District Judge